YE MYSTIC KREWE OF GASPARILLA, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20494–80.     Filed April 25, 1983.

*Michel G. Emmanuel* and *Nathaniel L. Doliner*, for the petitioners.
*Mark W. Nickerson*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes:

| Tax year ended | Deficiency |
|---|---|
| 2/28/75 ......................... | $2,944 |
| 2/29/76 ......................... | 2,920 |
| 2/28/77 ......................... | 3,160 |

After a concession by the petitioner, the issues for decision are: (1) Whether the income which the petitioner, an exempt social club, received from certain concessions and the sale of souvenirs in connection with an annual mock invasion and parade staged by it constitutes unrelated business taxable income within the meaning of section 512(a)(3)(A) of the Internal Revenue Code of 1954;[1] (2) whether the petitioner can deduct the expenses of staging the invasion and parade in computing its unrelated business taxable income; and (3) whether the income from a special ship fund constituted exempt function income under section 512(a)(3)(B).

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Ye Mystic Krewe of Gasparilla (the Krewe), is a nonprofit corporation organized under the laws of the State of Florida with its principal place of business at Tampa, Fla., at the time it filed its petition in this case. The Krewe filed its Return of Organization Exempt from Income Tax (Form 990) for fiscal years ending February 28, 1975, February 29, 1976, and February 28, 1977, with the Internal Revenue Service Center, Chamblee, Ga. We shall refer to a fiscal year by the calendar year in which it ends. The Krewe did not file Exempt Organization Business Income Tax Return (Form 990-T) for 1975, 1976, or 1977.

The Krewe was organized in 1904 and incorporated in 1911. According to its original articles of incorporation, the "object of * * * [the Krewe] shall be to hold annually in the city of Tampa a Carnival Ball, and such other social affairs as it may elect to have." In 1940, the Krewe received a determination by the Commissioner that it was exempt from tax as a social club under section 101(9) of the Internal Revenue Code of 1939, the

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

predecessor of section 501(c)(7) of the Internal Revenue Code of 1954. The Krewe has not applied for or received a determination that it is exempt under any other provision of the internal revenue laws.

During each of the years in issue, the Krewe sponsored a number of social events. Its social calendar began each April with the holding of the annual membership meeting. During 1976 and 1977, it held a King's Dinner and a Queen's Party. In November, the Krewe sponsored the King's Debutante Ball. In January, it sponsored the Gasparilla Tea Dance, at which the contestants for queen appeared. February was the busiest month on the Krewe's social calendar and included such events as the Captain's Ball, the Coronation Ball, and the Ybor City Night Parade and Closing Party.

In early February of each year, the Krewe staged its principal activity, a mock invasion of the city of Tampa. For such purpose, the Krewe had arranged for the construction of the Jose Gaspar, a replica of a West Indian bark used by pirates in the 18th century and named after a buccaneer who roamed the Gulf of Mexico in early Florida history. The ship was the only full-rigged pirate vessel known to be in commission. It was built of steel, had three masts, was 165 feet long, 35 feet wide, and 95 feet in height.

On the invasion day, Krewe members were made up with grease paint to look like pirates, complete with whiskers and scarred visages, and they were issued blank ammunition for use during the invasion and parade. At 10:30 a.m., the Jose Gaspar began the annual invasion with approximately 500 Krewe members, their guests, ship attendants, entertainers, and press members aboard. The ship was tugged across Hillsborough Bay followed by a flotilla of other craft. The ship fired thundering salutes from specially designed cannons, and the Krewe members fired pistols and muzzle loaders, and made a lot of noise. Upon landing, the pirates debarked and, after token resistance, captured the city of Tampa. The mayor surrendered the city to the pirates, and the Jolly Roger was run up the flagstaff of City Hall.

Following the surrender of the city, there was an annual parade, lasting approximately 2½ hours and including 40 to 50 floats, 18 to 20 bands, a number of horse units, drill teams, and "special feature" units. Some members of the Krewe rode on

the floats and discharged their weapons; other Krewe members walked along the parade route and handed out "gold" doubloons to children and other spectators. Still other members of the Krewe served as marshals controlling the parade and assisting the police in maintaining order along the parade route.

The Gasparilla invasion and parade attracted large crowds. The events were promoted by the Chamber of Commerce, and during the years 1975 through 1977, it was estimated that each year the crowd exceeded a half million people. There were no vacant hotel rooms within 50 miles of Tampa.

During the years in issue, the Krewe expended the following amounts in connection with the invasion and parade:

|  | 1975 | 1976 | 1977 |
|---|---|---|---|
| Insurance—invasion and parade | $6,546.29 | $8,147.23 | $8,701.44 |
| Ammunition and guns | 12,570.98 | 17,544.90 | 20,560.73 |
| Luncheons—ship and shore | 3,772.63 | 4,378.07 | 3,151.57 |
| Marshals and horses | 667.50 | 353.10 | 675.67 |
| Jeeps, cars, and drivers | 794.35 | 992.74 | 895.00 |
| Music for boat | 830.54 | 580.00 | 580.00 |
| Music for parade | 2,749.46 | 2,326.10 | 2,725.71 |
| Float equipment and maintenance | 7,148.93 | 9,402.90 | 8,731.57 |
| New float construction | 1,806.67 | 2,021.93 | 1,250.01 |
| Miscellaneous hauling and supplies | 2,166.29 | 2,124.52 | 2,258.00 |
| Regatta, Navy, etc. | 308.13 | 255.53 | 368.97 |
| Special features | 2,748.57 | 2,372.52 | 4,136.02 |
| Prizes for floats | 2,424.23 | 2,518.34 | 2,954.64 |
| Police working luncheon | 257.41 | 233.66 | 298.64 |
| Total | 44,781.98 | 53,251.54 | 57,287.31 |

During the years in issue, the city of Tampa awarded concession rights along the parade route to the Krewe. The Krewe entered into contracts with the American Legion of Tampa (American Legion) and with the Junior Chamber of Commerce of Tampa (Jaycees) to furnish seating and to sell food and beverages along the parade route, and under such contracts, the Krewe received 50 percent of the net income from such concessions. It also entered into contracts with the Martin Advertising Agency, Inc. (Martin), to produce and sell the official logbook of the Gasparilla Festival, and under such contracts, the Krewe received 40 percent of the net income from the sales of such logbooks and 30 percent of the income from the sale of advertising in the logbooks. As a result of such

contracts, the Krewe received the following income from the American Legion, the Jaycees, and Martin:

| AMERICAN LEGION | | | |
|---|---|---|---|
| 1975 .......................... | $377.65 | | |
| 1976 .......................... | 276.15 | | |
| 1977 .......................... | 367.08 | | |

| | 1975 | 1976 | 1977 |
|---|---|---|---|
| **JAYCEES** | | | |
| Income | $21,314.10 | $25,350.59 | $23,931.47 |
| Expenses | 7,633.09 | 9,306.67 | 8,744.78 |
| Net profit | 13,681.01 | 16,043.92 | 15,186.69 |
| 50% share to Krewe | 6,840.50 | 8,021.96 | 7,593.34 |
| **MARTIN** | | | |
| Advertising sales | 17,351.75 | 14,121.25 | 18,420.50 |
| Expenses | 12,691.75 | 10,656.95 | 13,364.75 |
| Net revenue | 4,660.00 | 3,464.30 | 5,055.75 |
| 30% share to Krewe | 1,398.00 | 1,039.29 | 1,516.25 |
| Logbook sales | 1,602.00 | 2,774.00 | 2,004.00 |
| Expenses | 450.50 | 743.50 | 501.00 |
| Net revenue | 1,151.50 | 2,030.50 | 1,503.00 |
| 40% share to Krewe | 460.60 | 812.20 | 601.20 |

Other than on invasion day, the Jose Gaspar was stowed in a berth "in a very visible spot" near downtown Tampa where the Krewe provided a marker containing historical information. The public were not permitted to board the vessel, but they were permitted to take photographs and view the ship from the pier without charge.

Participation in the events sponsored by the Krewe was restricted to the members and their guests. To become a member, a person had to be sponsored by two regular members and approved by a membership committee and by the board of directors of the Krewe. During the years in issue, members included dentists, merchants, insurance salesmen, bankers, and lawyers.

The Krewe levied annual assessments on its members, and during the years at issue, the bulk of its revenue was derived from such assessments. In addition, the Krewe derived revenue from other sources, including interest from savings

accounts and Treasury bills. Such interest amounted to $4,620.49 for 1975, $4,259.97 for 1976, and $4,709.97 for 1977.

The Krewe also levied a special assessment on its new members to be deposited in a "special ship fund." However, the money could be used for other purposes upon approval of the board of directors and, in fact, was used for another purpose on at least one occasion. In its financial statements, the Krewe reported that on such fund, it received interest of $1,073.34 in 1975, $1,332.72 in 1976, and $2,029.26 in 1977.

In his notice of deficiency, the Commissioner determined that the income which the Krewe received from the American Legion, the Jaycees, and Martin and as interest on its savings accounts and Treasury bills was unrelated business taxable income subject to the tax on such income. On brief, the Krewe conceded that the interest on its general funds, other than the special ship fund, is taxable.

### OPINION

We must ultimately decide whether the concession income (that is, the income from the American Legion, the Jaycees, and Martin) and interest on the special ship fund received by the Krewe is unrelated business taxable income within the meaning of section 512(a) that is subject to the tax imposed by section 511. In relevant part, section 512(a) defines unrelated business taxable income as:

(1) GENERAL RULE.—Except as otherwise provided in this subsection, the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b).

\* \* \* \* \* \* \*

(3) SPECIAL RULES APPLICABLE TO ORGANIZATIONS DESCRIBED IN SECTION 501(c)(7) OR (9).—

(A) GENERAL RULE.—In the case of an organization described in section 501(c)(7) or (9), the term "unrelated business taxable income" means the gross income (excluding any exempt function income), less the deductions allowed by this chapter which are directly connected with the production of the gross income (excluding exempt function income), both computed with the modifications provided in paragraphs (6), (10), (11), and (12) of subsection (b). \* \* \*

(B) EXEMPT FUNCTION INCOME.—For purposes of subparagraph (A), the term "exempt function income" means the gross income from dues, fees,

charges, or similar amounts paid by members of the organization as consideration for providing such members or their dependents or guests goods, facilities, or services in furtherance of the purposes constituting the basis for the exemption of the organization to which such income is paid. Such term also means all income (other than an amount equal to the gross income derived from any unrelated trade or business regularly carried on by such organization computed as if the organization were subject to paragraph (1)), which is set aside—

    (i) for a purpose specified in section 170(c)(4), * * *

       *      *      *      *      *      *      *

including reasonable costs of administration directly connected with a purpose described in clause (i) * * * . If during the taxable year, an amount which is attributable to income so set aside is used for a purpose other than that described in clause (i) * * * , such amount shall be included, under subparagraph (A), in unrelated business taxable income for the taxable year.

Thus, at the outset, we must consider whether the Krewe is a social club within the meaning of section 501(c)(7), subject to the special rules of section 512(a)(3).

In 1940, the Krewe was determined by the Commissioner to be exempt as a social club, and it has never sought or secured a determination that it qualified for exemption under any other provision of section 501. However, in its petition and at trial, the Krewe maintained that it also qualified as a civic league or organization within the meaning of section 501(c)(4) or as a business league within the meaning of section 501(c)(6). Yet, in its brief, the Krewe offered no arguments in support of such positions, and we consider that it has abandoned them. Moreover, it is clear that the Krewe does not qualify under either such provision. While the Gasparilla invasion and parade do serve some public purpose, most of the activities of the Krewe are restricted to its members and their guests and are not directed to, and do not result in, providing benefits either for the public at large or any community as a whole. The evidence shows beyond a doubt that the Krewe is primarily a social club, and such organization cannot qualify as a civic league under section 501(c)(4). Sec. 1.501(c)(4)-1(a), Income Tax Regs.; *American Women Buyers Club, Inc. v. United States*, 338 F.2d 526 (2d Cir. 1964); *People's Educational*

*Camp Society, Inc. v. Commissioner*, 39 T.C. 756 (1963), affd. 331 F.2d 923 (2d Cir. 1964).[2] Nor could the Krewe qualify as a business league since its membership included individuals from various professions and businesses and since the organization served no common business interest. Sec. 1.501(c)(6)-1, Income Tax Regs.; *American Automobile Association v. Commissioner*, 19 T.C. 1146, 1158 (1953); *Associated Industries of Cleveland v. Commissioner*, 7 T.C. 1449, 1465 (1946); compare *MIB, Inc. v. Commissioner*, 80 T.C. 438 (1983).

Now we can turn to the issue concerning the construction of section 512(a). The Krewe maintains that section 512(a)(3) merely provides rules for computing the income which a social club derives from a trade or business regularly carried on by it within the meaning of section 512(a)(1), that the annual staging of the Gasparilla invasion and parade does not constitute the regularly carrying on of a trade or business within the meaning of such provision, and that therefore it had no unrelated business taxable income for the years at issue. We agree that the staging of the Gasparilla invasion and parade is not a trade or business regularly carried on within the meaning of section 512(a)(1). See *Suffolk County Patrolmen's Association v. Commissioner*, 77 T.C. 1314 (1981). However, we do not agree with the Krewe's construction of section 512(a).

For taxable years beginning before January 1, 1970, social clubs were not subject to the tax on unrelated business income under section 511. Thus, unless its exemption was revoked, such a club was not taxable on its income. See and compare *Scofield v. Corpus Christi Golf & Country Club*, 127 F.2d 452 (5th Cir. 1942), and *Koon Kreek Klub v. Thomas*, 108 F.2d 616 (5th Cir. 1939), with *United States v. Fort Worth Club*, 345 F.2d 52 (5th Cir. 1965), modified 348 F.2d 891 (5th Cir. 1965), *Jockey Club v. Helvering*, 76 F.2d 597 (2d Cir. 1935), affg. 30 B.T.A. 670 (1934), and *Coastal Club, Inc. v. Commissioner*, 43 T.C. 783, 806 (1965), affd. 368 F.2d 231 (5th Cir. 1966).

The Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, subjected social clubs to the tax on unrelated business income for taxable years beginning after December 31, 1969. Such

---

[2] *Polish American Club, Inc. v. Commissioner*, T. C. Memo. 1974–207; *Lake Petersburg Association v. Commissioner*, T. C. Memo. 1974–55.

provision resulted from a proposal by the Treasury Department, and in explanation of its proposal, the Treasury Explanation stated:

under the proposal, *all* income, other than that from members in exchange for exempt function facilities, would be included in gross income, *whether or not the activities generating the income were sufficient to meet the requirements of a "trade or business regularly carried on" generally applicable under the unrelated business income tax.* * * * [Technical Explanation of Treasury Tax Reform Proposals, Hearings on the Subject of Tax Reform before the Comm. on Ways and Means, 91st Cong., 1st Sess., part 14, 5050, 5139–5140 (Apr. 22, 1969).]

In discussing the application of the unrelated business tax to social clubs, the Ways and Means Committee report provided, in part:

The bill also imposes a tax on investment income of organizations which are exempt on the grounds of mutuality or common membership. Social clubs, for example, are operated for the benefit of members and any profit derived from rendering the services to members is used by the club for the benefit of the members. Therefore, where a social club has income from interest, dividends, rents, royalties, etc., this income reduces the members' costs below the actual cost of providing the personal facilities made available by the organization. Because of this, *the bill would tax the social clubs and these other membership organizations on all income other than that derived from rendering services to the members. This income would be treated and taxed as business income.* [H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 231; emphasis added.]

The Senate Finance Committee report also stated:

Since the tax exemption for social clubs and other groups is designed to allow individuals to join together to provide recreational or social facilities or other benefits on a mutual basis, without tax consequences, the tax exemption operates properly only when the sources of income of the organization are limited to receipts from the membership. Under such circumstances, the individual is in substantially the same position as if he had spent his income on pleasure or recreation (or other benefits) without the intervening separate organization. However, where the organization receives income from sources outside the membership, such as income from investments * * * , upon which no tax is paid, the membership receives a benefit not contemplated by the exemption in that untaxed dollars can be used by the organization to provide pleasure or recreation (or other benefits) to its membership. For example, if a social club were to receive $10,000 of untaxed income from investments in securities, it could use that $10,000 to reduce the cost or increase the services it provides to its members. In such a case, the exemption is no longer simply allowing individuals to join together for recreation or pleasure without tax consequences. Rather, it is bestowing a substantial additional advantage to the members of the club by allowing

tax-free dollars to be used for their personal recreational or pleasure purposes. The extension of the exemption to such investment income is, therefore, a distortion of its purpose. [S. Rept. 91–552 (1969), 1969–3 C.B. 423, 469–470.]

Such legislative history demonstrates clearly that the rules of section 512(a)(3) were intended to provide an alternative method for determining the amount of the unrelated business taxable income of a social club and were not intended merely to limit the income otherwise determined under section 512(a)(1). Section 512(a)(1) provides a rule which is generally applicable to exempt organizations and taxes any income that they derive from regularly carrying on a trade or business. However, the obvious purpose of the rules under section 512(a)(3) was to provide that, in the case of a social club, any income derived by the organization from dealings with non-members was to be subjected to taxation. Congress clearly considered that nonmember income should not be used to subsidize the activities carried on for members, and there is absolutely no reason to believe that Congress meant for such a rule to apply only to income derived from a trade or business regularly carried on. In fact, the Treasury Explanation expressly rejects such a possibility, and the discussion in the committee reports of investment income also shows that the rules of section 512(a)(3) were not to be limited to income from a trade or business regularly carried on. If the Krewe's position were adopted, investment income or income from a business not regularly carried on could be used to subsidize the activities of members, and such a result is manifestly inconsistent with the objective of section 512(a)(3) and its legislative history.

In support of its position, the Krewe relies on certain statements contained in the Senate Finance Committee report:

Both the House bill and the committee amendments extend the unrelated business income tax to all exempt organizations (except United States instrumentalities created and made tax exempt by a specific act of Congress). The organizations newly made subject to this tax include churches and conventions or associations of churches, social welfare organizations, *social clubs,* fraternal benefit societies, employees' beneficiary organizations, teachers retirement fund associations, benevolent life insurance associations, cemetery companies, credit unions, mutual insurance companies, and farmers cooperatives formed to finance crop operations.

As under present law, *this tax does not apply unless the business is "regularly" carried on and therefore does not apply, for example, in cases where income is derived from an annual athletic exhibition.* In the case of membership organizations, income resulting from charges to members for goods, facilities, and services supplied in carrying out the exempt function is not subject to tax.

[S. Rept. 91–552, *supra*, 1969–3 C.B. at 467; emphasis added.]

From such statements, the Krewe argues that all the organizations subjected to the unrelated business tax by that legislation are subject to the "regularly carried on" requirement. However, in our view, such an interpretation of the committee report takes the underlined sentence out of context and disregards the legislative history dealing particularly with the treatment of social clubs. The quoted material indicates that the unrelated business tax is being made applicable to virtually all exempt organizations, and some of those organizations are subject to the general rule of section 512(a)(1) for defining the income subject to tax. A reading of the entire legislative history shows that the underlined sentence must have been intended to apply to those organizations which are subject to the general rule of section 512(a)(1), but it is utterly inconsistent with the particular discussion of social clubs to construe that such sentence was also intended to apply to them. Accordingly, we conclude and hold that the concession income and interest received by the Krewe are unrelated business taxable income within the meaning of section 512(a)(3).[3] See generally *Council of British Societies in Southern California v. United States,* an unreported case (C.D. Cal. 1978, 42 AFTR 2d 78–6014, 78–2 USTC par. 9744).

The next issue for decision is whether the Krewe is entitled to offset the expenses of staging the invasion and parade against the concession income received by it. The resolution of such issue depends upon whether the expenses of staging the invasion and parade were "directly connected with the production" of the concession income within the meaning of section 512(a)(3)(A). In this case and in his proposed regulations, the

---

[3]The Krewe has not argued that the concession income received by it was exempt function income within the meaning of sec. 512(a)(3)(B), and it has made no attempt to prove specifically that such income was set aside within the meaning of such provision or that it was used for a purpose described in sec. 170(c)(4). Consequently, we have not considered such issue.

Commissioner takes the position that to be deductible under such provision the expenses must be "directly connected with the income and incurred in the production of such income." Sec. 1.512(a)-3(b), Proposed Income Tax Regs., 36 Fed. Reg. 8808, 8809 (May 13, 1971).

The term "directly connected with" is also used in section 512(a)(1) to describe the deductions which are allowable in computing the unrelated business taxable income derived from an unrelated trade or business regularly carried on by an exempt organization subject to that provision. The regulations under such provision take the position that the "directly connected with" language has the effect of imposing a requirement in addition to that otherwise applicable to a claimed deduction and that to satisfy such requirement, an expense must have a "proximate and primary" relationship to the carrying on of the unrelated trade or business. Sec. 1.512(a)-1(a), Income Tax Regs. The meaning of the requirement of section 512(a)(1) was considered by the Court of Claims in *Iowa State University of Science & Tech. v. United States*, 205 Ct. Cl. 339, 500 F.2d 508 (1974). The university operated a commercial television station, and the court held that such activity constituted an unrelated trade or business the income from which was taxable. The university also operated noncommercial AM and FM radio stations, and the court had to decide whether the expenses of operating the radio stations could be included in computing the income on which the university was taxable. The court examined the cases involving membership organizations which carried on income-producing activities and in which it was held that the income-producing activity was a separate activity and that only the expenses of carrying on that activity could be offset against the income from such activity. See, for example, *Five Lakes Outing Club v. United States*, 468 F.2d 443 (8th Cir. 1972); *Adirondack League Club v. Commissioner*, 55 T.C. 796 (1971), affd. per curiam 458 F.2d 506 (2d Cir. 1972). The court concluded that for purposes of applying section 512(a)(1), a similar test should be applied, that the operation of the commercial television station was a separate activity, and that only the expenses of carrying on that activity could be offset against the income derived therefrom. See also *Rensselaer Polytechnic Inst. v. Commissioner*, 79 T.C. 967 (1982); *Disabled American Veterans v.*

*United States*, 227 Ct. Cl. 474, 650 F.2d 1178 (1981), unreported supplemental opinion, June 22, 1982 (50 AFTR 2d 82–5206, 82–2 USTC par. 9440).

We are convinced that to carry out the purpose of section 512(a)(3), a similar test must be applied. The staging of the invasion and parade were principal activities of the Krewe, and those activities would have been carried on irrespective of the concession income. Thus, the invasion and parade were activities carried on independently of the operation of the concessions, and the expenses of those activities were independent from the production of the concession income. On the other hand, the expenses of securing the seating, of securing and distributing the refreshments, and of producing and selling the logbooks, were the only expenses directly related to the production of the concession income, and since the Krewe received only a share of the *net* income from such concessions, those expenses have been allowed in computing the Krewe's unrelated business income.

Moreover, the adoption of the interpretation urged by the Krewe would frustrate the purpose of section 512(a)(3). The purpose of that provision is to tax the income which a social club receives from nonmember sources; thus, such income cannot be used to subsidize the activities of the members without being subject to taxation. If the position of the Krewe were adopted, the concession income would wholly avoid taxation. Such income could be used to subsidize the staging of the invasion and parade without being subjected to taxation. To carry out the purpose of section 512(a)(3), the production of the concession income must be viewed as a separate activity, and in determining the amount subjected to taxation, only the expenses directly connected with the production of such income are deductible. Hence, we hold that the Krewe is not entitled to deduct the expenses of staging the invasion and parade.

The last issue for decision is whether interest from the special ship account constituted exempt function income. The Krewe maintains that for 364 days a year, the ship was moored at a pier in downtown Tampa where it could be viewed by the public; thus, it argues that during such time, the ship served an educational purpose and that therefore the interest from the special ship fund was used for a purpose described in

section 170(c)(4). The Commissioner disputes that the interest from such fund was set aside as required by section 512(a)(3)(B) and that such interest was used for an educational purpose within the meaning of section 170(c)(4). The Krewe has the burden of proving that the income from the special ship fund constituted exempt function income. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). In our view, the Krewe has wholly failed to prove that the fund was set aside for purposes described in section 170(c)(4).

The Krewe did provide a marker setting forth historical information, but the public was not allowed aboard the ship. Other than to state that the fund was established to maintain the ship, and that the public could look at such ship from the pier, the Krewe introduced no evidence showing that the income from the fund was used for an educational purpose. The record shows that the ship was constructed to participate in the mock invasion, and the mere fact that at other times, it was available for the public to view is not enough to show that the income from the special ship fund served an educational purpose. Accordingly, we hold that the Krewe has failed to prove that the income from the special ship fund constituted exempt function income.[4]

*Decision will be entered for the respondent.*

---

[4]We need not and do not pass on the meaning of the "set aside" requirement of sec. 512(a)(3). The Commissioner argues that such requirement was not satisfied because the Krewe failed to prove that the fund was established in the requisite manner or because the income had, on occasion, been used for other purposes. "Set aside" requirements are also contained in secs. 512(a)(4) and 642(c). See secs. 1.512(a)-4(b)(5), 1.642(c)-2(d), Income Tax Regs. We need not decide in this case how the "set aside" provision of sec. 512(a)(3)(B) should be construed since the Krewe has failed to prove that the income was set aside for an educational purpose.