**ROLLING ROCK CLUB, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 85–3329.

United States Court of Appeals,
Third Circuit.

Argued Jan. 14, 1986.
Decided March 5, 1986.

John K. Barry (Argued), Thomas L. Peters, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellant.

Robert A. Bernstein, Kenneth L. Greene (Argued), Michael L. Paup, Chief, Appellate Section, U.S. Dept. of Justice, Tax Div., Washington, D.C. for appellee.

Before SEITZ and GIBBONS, Circuit Judges, and BARRY, District Judge.[*]

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The plaintiff, Rolling Rock Club, appeals the denial of its motion for summary judgment and the grant of summary judgment to the government in this action under 26 U.S.C. § 7422 (1982) for a refund of $329,918.57 plus interest paid for taxes and interest after the Internal Revenue Service disallowed dividends received deductions claimed for the tax years 1974 and 1975. We have jurisdiction under 28 U.S.C. § 1291 (1982).

### I.

The issue presented to us is whether the plaintiff, a tax exempt social club under 26 U.S.C. § 501(c)(7), may claim the dividends received deduction allowed by 26 U.S.C. § 243 (1982) against its "unrelated business income" from dividends on investments. Such dividends have been taxable to tax exempt social clubs since 1969 under 26 U.S.C. § 501(b), 511, and 512(a)(3) (1982).

The relevant facts are not disputed. Rolling Rock Club is a nonprofit Pennsylvania corporation with its principal offices in Ligonier, Pennsylvania. Rolling Rock is classified as a tax exempt social club under section 501(c)(7), which, during the years relevant to this appeal, exempted from taxation all income, except unrelated business income, of "[c]lubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of

the net earnings of which inures to the benefit of any private shareholder."

Rolling Rock had substantial dividend income for the tax years 1974 and 1975 and filed returns which claimed against this income the dividends received deduction allowed corporations under 26 U.S.C. § 243. Section 243 allows a corporation receiving dividends from domestic corporations to deduct 85% of the sum of the dividends from its income subject to taxation. § 243(a)(1).

It is undisputed that the dividend income was subject to taxation under sections 501(b) and 511, which provide for taxation of unrelated business income of exempt organizations, and section 512(a)(3), which prior to 1976 defined such income as "the gross income (excluding any exempt function income), less the deductions allowed by this chapter which are directly connected with the production of the gross income." § 512(a)(3)(A). Exempt function income, as relevant here, "means the gross income from dues, fees, charges, or similar amounts paid by members ... as consideration for providing such members ... goods, facilities, or services in furtherance of the purposes constituting the basis for the exemption of the organization to which such income is paid." § 512(a)(3)(B).

Rolling Rock claimed dividends received deductions of $404,654 and $150,454 for the years 1974 and 1975 respectively. The IRS audited Rolling Rock, disallowed the deductions, and assessed deficiencies. Rolling Rock paid the assessments plus interest in 1979, an amount totalling $329,918.57, and brought an action in the district court for a refund of that money plus interest.

The district court granted the government's motion for summary judgment. It found Rolling Rock not entitled to the deductions. Because the dividends received deduction arises from the nature of the income and not from the activity which produces it, the court held that "by definition, [it] cannot be 'directly connected with the production of gross income,' i.e., it-

---

[*] The Honorable Maryanne Trump Barry, United States District Judge for the District of New Jersey, sitting by designation.

*self.*" Memorandum Opinion, April 11, 1985, p. 8 (emphasis in original).

## II.

We are therefore called upon to construe the phrase "directly connected with the production of the gross income." While this appears to be one of the less cryptic phrases in the tax code, the existence of the instant dispute requires us to delve into its legislative history.

## A.

Although Congress first imposed a tax on the unrelated business income of tax exempt social clubs with the passage of the Tax Reform Act of 1969, Pub.L. 91–172, December 10, 1969, 83 Stat. 487, it first started taxing such income for some types of tax exempt organizations as early as 1950. In Section 301 of the Revenue Act of 1950, Pub.L. No. 814, Sept. 23, 1950, 64 Stat. 947, *codified at* 26 U.S.C. § 511, Congress subjected income of certain tax exempt organizations arising "from active business enterprises which are unrelated to the exempt purposes of the organizations [to] the regular corporate income tax." S.Rep. No. 2375, 81st Cong., 2d Sess. 27 (1950), *reprinted in* 1950 U.S.Code Cong. Serv. 3053, 3079.

Congress' purpose in taxing such income was to deter unfair competition where tax exempt organizations were operating active enterprises, often in direct competition with non-tax exempt organizations. The tax then equalized treatment of exempt and nonexempt organizations by "impos[ing] the same tax on income derived from an unrelated trade or business as is borne by their competitors." *Id.* at 3081. Dividends, being "'passive' in character and ... not likely to result in serious competition for taxable businesses having similar income," *id.* at 3083, were not included in unrelated business income and therefore not taxed to those tax exempt organizations that received them.

In 1969, Congress expanded section 511's sweep to tax unrelated business income of "virtually all exempt organizations,"

H.Rep.No. 91–413, 91st Cong., 1st Sess., *reprinted at* 1969 U.S.Code Cong. & Admin.News 1645, 1692, including social clubs.

Congress' decision "to expand the categories of tax-exempt organizations which are subject to unrelated business income tax" was motivated by the desire "to avoid unequal treatment of the various types of tax-exempt organizations." *Id.* at 1689. Congress found "inequity in taxing certain exempt organizations on their 'unrelated business income' and not taxing others. It [had] become apparent that organizations [then] subject to the provision and those not subject to it [were] equally apt to engage in unrelated business." *Id.* at 1692.

The Senate report notes that "many of the exempt organizations not now subject to the unrelated business income tax—such as churches, fraternal beneficiary societies, etc.—have begun to engage in substantial commercial activity.... [I]t is difficult to justify taxing a university or hospital which runs a public restaurant or hotel or other business and not tax a country club or lodge engaged in similar activity." Sen. Rep. 91–552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Admin.News 2096. It may be fairly said, then, that Congress' reason for expanding the scope of section 511 was simply to extend its policy, first implemented in 1950, of reducing unfair competition to the taxed sector from business activities carried on by exempt organizations which were unrelated to the activity for which the organization was exempted from taxation.

## B.

The inclusion for the first time of social clubs in the category of tax exempt organizations whose unrelated business income would be taxed was not the only change made by the Tax Reform Act of 1969 which is relevant here. Congress pinpointed a particular problem with respect to the investment income of "organizations which are exempt on the grounds of mutuality or common membership," H.Rep. 91–413, *re-*

*printed in* 1969 U.S.Code Cong. & Admin. News 1693, such as social clubs.

Since the tax exemption for social clubs ... is designed to allow individuals to join together to provide recreational or social facilities on a mutual basis, without tax consequences, the tax exemption operates properly only when the sources of income of the organization are limited to receipts from the membership. Under such circumstances, the individual is in substantially the same position as if he had spent his income on pleasure or recreation without the intervening separate organization. However, where the organization receives income from sources outside the membership, such as income from investments, upon which no tax is paid, the membership receives a benefit not contemplated by the exemption in that untaxed dollars can be used by the organization to provide pleasure or recreation to its membership. In such a case, the exemption is no longer simply allowing individuals to join together for recreation or pleasure without tax consequences. Rather, it is bestowing a substantial additional advantage to the members of the club by allowing tax free dollars to be used for their personal recreational or pleasure purposes. The extension of the exemption to such investment income is, therefore, a distortion of its purpose.

*Id.* at 1693 (virtually identical language is found in the Senate Report, Sen.Rep. 91–552, *reprinted in* 1969 U.S.Code Cong. & Admin.News 2100).

For this reason, the Tax Reform Act of 1969 provided for taxation of such income "at regular corporate rates," Sen.Rep. 91–552, *reprinted in* 1969 U.S.Code Cong. & Admin.News 2101, for social clubs, fraternal beneficiary associations, and employee beneficiary associations, while retaining the distinction between "passive income which is free of tax and active business income which is subject to tax," *id.* at 2096, for the other types of exempt organizations. Congress extended the taxation of unrelated business income to virtually all types of exempt organizations under section 511 because of their equal propensity "to engage in substantial *commercial* activity." *Id.* (emphasis added).

Taxation of the investment income of social clubs was accomplished by defining unrelated business taxable income of social clubs in 26 U.S.C. § 512(a)(3) as "the gross income (excluding any exempt function income), less the deductions allowed by this chapter which are directly connected with the production of the gross income (excluding exempt function income)." Section 121(b) of the Tax Reform Act of 1069, Pub.L. 91–172, Dec. 30, 1969, 83 Stat. 487.

The general policy reason for taxing exempt organizations on their unrelated business income, therefore, is to equalize tax treatment for such activities between exempt and nonexempt organizations, and thereby to prevent unfair competition. The specific policy reason for taxing the investment income of social clubs as unrelated business income, however, is entirely different; Congress did not want to subsidize the recreation of club members by failing to tax income earned by unrelated business activity. There is no mention of tax symmetry in Congress' discussion of its reasons for taxing the investment income of social clubs.

### C.

The dividends received deduction established by 26 U.S.C. § 243 has an entirely separate history from that of taxation of certain income of tax exempt organizations. The policy behind it was explained in Revenue Ruling 104, 1953–1 C.B. 68:

The credit for dividends received ... is based upon a theory that a corporate tax has already been paid upon the earnings out of which the dividends are distributed.

A corporate tax, in other words, has already been paid on the earnings which generate the dividends before they are distributed. Congress felt that it would result in excessive taxation to tax such dividends fully again as earnings of the receiving corporation, and once more when those

earnings are distributed as dividends to the shareholders. At that stage, the earnings would have been taxed three (or more) times before their enjoyment as after tax income by the shareholders. *See* Sen.Rep. 94–1318, 94th Cong., 2d Sess. 6, *reprinted in* 1976 U.S.Code Cong. & Admin. News 6056.

### III.

#### A.

■ On its face, the language of the 1969 version of section 512(a)(3), which allows deductions only where they are "allowed by this chapter [ (i.e., Chapter One of the 1954 Code) and] directly connected with the production of the gross income," would seem to allow only those deductions which arise in the course of engendering the gross income. Such deductions in the case of dividend income might include stock transfer fees and similar costs. While the dividends received deduction is allowed by Chapter 1 of the 1954 Code, it is not a deduction for an expense incurred in the production of the income. As the district court held, it comes into being as a consequence of the very existence of the income. To hold that section 512 allowed the use of the dividends received deduction in the computation of unrelated business taxable income, then, we would have to read the word "production" out of the statute.

■ An interpretation of section 512's language that would disallow the dividends received deduction is supported by the legislative history. It is true that Congress was generally concerned with reducing unfair competition between exempt and nonexempt organizations when it decided to tax the unrelated business income of tax exempt organizations. However, its sole concern in including investment income in its definition of such income with respect to social clubs seems to have been the prevention of any windfall to club members resulting from the provision of services using untaxed income other than their exempt function income.

■ The dividends received deduction is structured so that the profits of the receiving corporation, part of which flows from the dividends, will be taxed a final time as income in the hands of shareholders. When dividends are received by a tax exempt social club, however, and are not taxed, the members receive a distribution in the form of enhanced services. The failure to tax this enhancement creates precisely the type of windfall that Congress sought to prevent when it decided to tax "passive" unrelated income of social clubs while leaving the passive unrelated income of other tax exempt organizations such as charities and universities untaxed. Thus, both Congress' intent and the plain language of the statute point to the correctness of the district court's decision.

#### B.

In response, Rolling Rock claims that the district court ignored the meaning and intent of the 1969 Act and distorted the legislative history. Rolling Rock's arguments, many of which are interdependant, run essentially as follows.

Rolling Rock argues that Congress intended that the unrelated business income tax establish tax neutrality between exempt and nonexempt organizations to the extent they competed in the market place. Further, tax neutrality was to be achieved by taxing the clubs "at regular corporate rates," Sen.Rep. 91–552, *reprinted in* 1969 U.S.Code Cong. & Admin.News 2101.

Nonexempt social clubs were prohibited by 26 U.S.C. § 277, Section 121(b)(3)(A), Tax Reform Act of 1969, Pub.L. 91–172, Dec. 30, 1969, 83 Stat. 487, *reprinted in* 1969 U.S.Code Cong. & Admin.News 574, from deducting losses arising from membership expenses in excess of income from the membership against business or investment income, thus preventing such clubs from providing services to members below cost and at the same time realizing beneficial tax consequences as against other income. In 1976, both sections 512(a)(3) and 277 were amended to deny the dividends received deduction to exempt and non-

exempt clubs. Sections 1(b) and (c), Pub.L. 94–568, October 20, 1976, 90 Stat. 2697. The new section 512(a)(3), for example, added to the old definition of unrelated business taxable income a provision that in the case of tax exempt social clubs "the deductions provided by section ... 243 ... (relating to dividends received by corporations) shall be treated as not directly connected with the production of gross income." § 512(a)(3)(A).

If we were to agree that tax neutrality was the dominant policy behind the taxation of social clubs' investment income, then Rolling Rock's first argument would be superficially appealing. The argument proceeds as follows: nonexempt clubs are corporations (generally). Before 1976, their ultimate tax rate was determined after they deducted the dividends received deduction. Section 277 did not prevent the use of this deduction. The policy of tax neutrality should then lead us to the conclusion that the pre-1976 section 512, which was silent on this issue, did not bar tax exempt social clubs from taking the deduction either. In fact, by mandating taxation at the "regular corporate rates" (that language is from the committee reports, not from the Act) section 512 seemed to provide for allowing the deduction. Finally, Rolling Rock concludes, in 1976, when Congress decided to close the door on subsidizing membership services by disallowing the deduction, it preserved tax neutrality by disallowing the deduction to both categories of clubs.

Rolling Rock attempts to bolster this argument by pointing out that Congress in 1976 struck a retroactivity provision from the amendment to section 512 which would have explicitly disallowed the deduction for the years in question here. Further, they point to *Ye Mystic Krewe of Gasparilla v. Commissioner*, 80 T.C. 755 (1983), as support for their contention that the "directly connected with the production of gross income" language is intended solely to ensure that deductions may be claimed only against income earned in the same income producing activity which gives rise to the deduction. In that case, the issue before the court was whether expenses incurred in the carrying out of the exempt activity, putting on a parade, could be deducted against the unrelated business income garnered from granting concessions along the parade route. The Tax Court held that "[t]o carry out the purpose of section 512(a)(3) [which the court correctly pointed out was prevention of the subsidization of the activities of the members], the production of the concession income must be viewed as a separate activity and in determining the amount subjected to taxation, only the expenses directly connected with the production of such income are deductible." *Id.* at 767.

Rolling Rock's carefully erected argument collapses, however, when its faulty underpinnings are revealed. As noted above, the policy of tax neutrality did not motivate Congress' decision to tax the investment income of social clubs, nor is there any indication that we should read section 512 to construe the "directly connected with the production of the gross income" language in such a way that tax neutrality is preserved if such a reading would erode section 512's expressed purpose. The fact that the two sections would have disallowed the deduction for tax exempt clubs and allowed it to nonexempt clubs, assuming without deciding that section 277 would have allowed nonexempt clubs the deduction, would not violate the policy which did in fact motivate the enactment of section 512(a)(3). It would, however, create another problem, which is that exempt clubs might decide to forego tax exempt status in order to take advantage of the dividends received deduction. That problem was addressed when Congress in 1976 denied the dividends received deduction to nonexempt clubs, *see* Sen.Rep. 94–1318, 94th Cong., 2d Sess. 7 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 6057 (discussing the amendment of section 277 and why the deduction was to be disallowed to nonexempt clubs).

In fact, Congress in 1976, in amending section 512(a)(3) expressly to disallow the dividends received deduction to tax exempt

clubs, stated that it was clarifying the meaning of the 1969 Act in a manner consistent with the Treasury's interpretation of that Act as expressed in its proposed regulations. Those proposed regulations took the position that the dividends received deduction was not directly connected with the production of gross income. *See* Proposed Treasury Reg. § 1.512(a)–3, *published* May 13, 1971, 36 Fed.Reg. 8808 (1971).

> [T]he committee believes that the proposed treasury regulations disallowing the dividends received deduction are consistent with the intent and structure of the provision (sec. 512(a)(3)) enacted in the Tax Reform Act of 1969, which allows deductions in the case of investment income of social clubs ... only in the case of deductions directly connected with the production of income. The bill specifically clarifies this point by providing that in these cases the dividends received deduction is not to be considered as directly connected with the production of gross income.

Sen.Rep. 94–1318 at 6, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6056.

Further, Rolling Rock's reliance on the *Gasparilla* case is misplaced. At best, it is simply irrelevant to this problem; however, we note that its repetition of the "directly connected with the production of ... income" language undercuts Rolling Rock's argument. Had Congress intended to limit deductions for each activity to those traditionally associated with that type of activity, as Rolling Rock contends, this choice of language would have been most peculiar and indirect.

Similarly, we must reject Rolling Rock's contention that by "taxation at the regular corporate rates," Congress meant taxation to the same extent ultimately paid by corporations generally after all deductions have been taken. Rolling Rock bases this contention on a colloquy from the House committee hearings between Representatives Mills and Waggoner concerning the rate to be applied to fraternal organizations, which under the original House version of the 1969 Act were also to be taxed on investment income, *see* H.Rep. 91–413, *reprinted in* 1969 U.S.Code Cong. & Admin.News 1694–95.

In that colloquy, Representative Waggoner asked Representative Mills whether the investment income of fraternal organizations would be taxed at the same rate as businesses rather than at the 7½ per cent rate applicable to foundations. Representative Mills replied that fraternal organizations would be taxed at the regular corporate rates. He then noted that the rate for foundations, which develop most of their income from investments, had been set at 7½ per cent because "if a foundation were a corporation, then the corporate dividends received deduction would come into play, under which the corporation deducts 85 percent of total investment income from the tax, and leaves 15 percent subject to tax, which with a tax rate of 50 percent means a 7½ percent [tax] on the whole income." 115 Cong.Rec 22759 (1969).

Even assuming arguendo that Congressman Mills meant in this colloquy that he considered the "corporate rate" to be 7½ percent, we cannot ignore Congress' usage of the word "rate" to mean the percentage assigned, in the case of corporate income, by 26 U.S.C. § 11, irrespective of which deductions may be taken. In fact, Congressman Mills' statement gives the *rate* as 50 percent, not 7½ percent as argued by Rolling Rock.

Section 511 clearly states that "[t]here is hereby imposed for each taxable year on the unrelated business taxable income ... of every organization described in paragraph (2) [including social clubs] a tax computed as provided in section 11." That Congress considers the percentages set forth by section 11 to be the "regular corporate rate" irrespective of which deductions are applicable or claimed seems hardly open to question. *See, e.g.,* House Conference Report 97–215, August 1, 1981, 97th Cong, 1st Sess (1981), *reprinted in* 1981 U.S.Code Cong. & Admin.News 320 (amendments to 26 U.S.C. § 11 described as "corporate tax rate reductions;" and de-

scription of section 11: "[u]nder present law, the corporate income tax is imposed at the following rates").

### C.

Rolling Rock presents several additional theories to shore up its principal arguments. First, it claims that Congress used the word "clarify" in the 1976 Act in a broad sense to describe substantive changes in the law, and cites several other minor inconsistencies in the legislative history which show, at best, that Congress did not speak with complete unanimity when it used the word "clarify." *See, e.g.,* Summary of H.R. 1144, 94th Cong., 2d Sess. 184 (1976) (prepared by Rep. Waggoner: "these exempt organizations are entitled to the corporate dividends received deduction [prior to the 1976 Act]"). In addition, they cite cases for the proposition that committee reports of subsequent Congresses purporting to explain an earlier Congress' intent are entitled to little, if any, weight, *e.g., Consumer Product Safety Comm. v. GTE Sylvania, Inc.,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980).

Such cases cut both ways here, however, because it is Rolling Rock itself that presses upon us the actions and expressions of the 94th Congress to explain the intent of the 91st. As explained above and as held by the district court, it is plain from both the language of the 1969 Act and its legislative history that the dividends received deduction is not allowable under the 1969 version of section 512(a)(3). While the "clarify" language of the 94th Congress is entirely consistent with and thus supportive of that reading, the expressions of the 94th Congress are not dispositive either way. We decide this question under the law as it existed during the pertinent period.

Finally, as a guide to the interpretation of the language "directly connected to the production of the gross income," Rolling Rock points to Congress' use of that phrase in Section 301(a) of the Tax Reform Act of 1969, Pub.L. 91–172, 91st Cong., 1st Sess., December 30, 1969, 83 Stat. 487, *reprinted* 1969 U.S.Code Cong. & Admin. News 623–26, *codified* at 26 U.S.C. §§ 56, 57, 58, *and subsequently repealed,* section 301(c)(1)(A), Tax Reform Act of 1976, Pub.L. 94–455, October 26, 1976, 90 Stat. 1550. In that section, Congress enacted a minimum tax "on the sum of every individual's or corporation's tax preferences in excess of $30,000," Sen.Rep. 91–552, *reprinted in* 1969 U.S.Code Cong. & Admin. News 2033, to prevent "individuals and corporations [from] escap[ing] tax on certain portions of their economic income result[ing] in an unfair distribution of the tax burden [and] large variations in the tax burdens placed on taxpayers who receive different kinds of income." *Id.* at 2143. Section 57(b)(2)(C) states "[t]he term 'investment expenses' means the deductions allowable under section . . . 243 [and other sections] . . . directly connected with the production of investment income." Rolling Rock claims that this language shows that Congress considered the dividends received deduction to be within the "directly connected" category.

Rolling Rock's argument might sway us, were it not for the language prefacing section 57(b)(2), the definition subsection, which limits the following definitions to the "purposes of this subsection." That Congress intended such a limitation is borne out by the Senate Report, which states that "investment expenses *for this purpose* . . . include . . . dividends received, [sic] deduction allowed corporations, . . and other expenses to the extent these expenses are directly attributable to the production of such investment income." Sen.Rep. 91–552, *reprinted in* 1969 U.S.Code Cong. & Admin.News 2145 (emphasis added). Thus, section 57 actually confirms our view of the meaning of the language in section 512(a)(3), for if it were self explanatory that the dividends received deduction were directly connected with the production of investment income, Congress would not have needed to so specify for the particular purposes of section 57.

### IV.

Based on the language and legislative history of the Tax Reform Act of 1969, we

hold that Rolling Rock was not entitled to claim the dividends received deduction against its investment income for the years 1974 and 1975, and thus is not entitled to a refund for the challenged tax payments. We will therefore affirm the judgment of the district court.