NORTH RIDGE COUNTRY CLUB, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20651-82.        Filed September 15, 1987.

*Alvin R. Wohl, Michael P. Casterton,* and *Robert L. Gallaway,* for the petitioner.
*Paul J. Krug,* for the respondent.

OPINION

KÖRNER, *Judge:* This case was assigned to Special Trial Judge Helen A. Buckley pursuant to the provisions of section 7456(d)(3) of the Code (redesignated sec. 7443A(b)(3) by sec. 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rules 180, 181, and 182.[1] The Court agrees with and adopts her opinion which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

BUCKLEY, *Special Trial Judge:* Respondent determined a deficiency of $2,846 in petitioner's 1979 Federal income tax.

97-34), prepared by the Staff of the Joint Comm. on Taxation 267 (1981), at 267 (Comm. Print 1981).

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

The issue before the Court is whether petitioner, a section 501(c)(7) tax-exempt social club with different sources of "unrelated business taxable income," may offset net gain from one source of unrelated business taxable income with the excess deductions from another such source.

FINDINGS OF FACT

Some of the facts have been stipulated, and unless otherwise noted, those facts are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner is a private social club exempt from tax pursuant to section 501(c)(7). Petitioner's exempt status was granted on September 24, 1954. Petitioner timely filed an Exempt Organization Business Income Tax Return and a Return for Organization Exempt From Income Tax, Forms 990-T and 990, respectively, for 1979. On June 7, 1982, respondent issued a valid notice of deficiency and petitioner timely filed its petition for redetermination.[2] At that time and at all other times relevant to this litigation, petitioner had its principal place of activity and business in Fair Oaks, California.

Petitioner operates a golf club, restaurant and bar, swimming pool, and tennis courts for the benefit of its members and their guests. This is and always has been petitioner's purpose. In addition to maintaining facilities for its members, petitioner also, from time to time, makes its facilities available to nonmembers.[3]

Petitioner derives revenue from members as well as nonmembers. For 1979, petitioner had total revenue in excess of $1,200,000. All of the revenue, except for $118,789, came from members, either as membership dues or fees for services provided to members and/or their guests. Of the $118,789 in revenue which did not derive from members or their guests, $10,098 represents interest income and the remainder came from the following stipulated nonmember activities:[4] golf, golf cart rentals; food

[2]The National Club Association has been allowed to file briefs amicus curiae.
[3]Nonmembers are individuals who use petitioner's facilities but are neither club members nor guests of members.
[4]Nonmember activity is used generically to identify the source of revenues other than those which derive from members.

sales; beverage sales; and guest fees.

The parties stipulated that during 1979 petitioner derived revenue from nonmember activities and incurred expenses directly connected with those activities as follows:

|  | Golf | Golf carts | Food | Bar | Guest fees | Interest |
|---|---|---|---|---|---|---|
| Revenue | $13,170 | $11,819 | $39,281 | $43,406 | $1,015 | $10,098 |
| Expenses: |  |  |  |  |  |  |
| Direct | 8,820 | 3,975 | 43,389 | 28,225 |  |  |
| Utilities | 54 | - - - | 1,899 | 2,099 |  |  |
| Property taxes | 36 | - - - | 1,259 | 1,392 |  |  |
| Depreciation | 352 | 2,023 | 3,461 | 3,824 |  |  |
| General administration | 2,004 | 1,798 | 5,977 | 6,605 | 154 |  |
| Club house | 627 | 563 | 1,870 | 2,066 | 48 |  |
| Total expenses | 11,893 | 8,359 | 57,855 | 44,211 | 202 |  |
| Net income | 1,277 | 3,460 | (18,574) | (805) | 813 | 10,098 |

The expenses listed as direct expenses are those which are incurred and increased in direct proportion to the volume of the particular nonmember activity. Included here are items such as additional labor costs and costs of goods sold. Each dollar of direct expense is traceable to the particular nonmember activity and would not have been incurred but for the activity.

The other expenses (for simplicity referred to as indirect) are those which are either fixed or quasi-fixed. Those which are fixed, such as property taxes and depreciation, are incurred by petitioner whether or not there is nonmember activity. The other indirect expenses, such as utilities, general administration, and club house expense may be increased by nonmember activity, but the increases are only nominal or bear no calculable relationship to a particular nonmember activity.[5] For purposes of computing net income, indirect expenses are allocated to each nonmember activity although they are not traceable to any particular nonmember activity.

Although the expenses attributable to nonmember activities are analyzed and recorded in terms of whether they bear direct relationships with each respective activity, the parties have stipulated that all the expenses in issue are

[5]For example, utilities expense certainly is increased by the volume of food sales to nonmembers. More than likely, petitioner receives utility bills based on total usage. The only way to trace utility expense to each activity would be to know how many measuring units (e.g., kilowatt hours for electricity) are attributable to nonmember food sales as opposed to member food sales. This is obviously a very difficult if not an impossible task.

directly connected with[6] the production of the gross income for each activity.

The nonmember revenues, other than the interest income, derive from two sources. First, petitioner allows its facilities to be used for a number of nonmember golf tournaments each year. These tournaments are held on days when the facilities are closed to members.[7] Civic or charitable organizations normally sponsor the nonmember tournaments. In order for nonmembers to secure the use of petitioner's facilities for tournaments, the following requirements must be met:

(1) There must be at least 130 tournament participants;

(2) A course marshal must be provided;

(3) All participants must use golf carts rented from petitioner;

(4) Prizes must be purchased from petitioner's Pro Shop and there must be a certain guaranteed expenditure from the shop; and

(5) The organization sponsoring the tournament must have a banquet or luncheon using petitioner's dining facilities. These requirements are part of a comprehensive policy developed by petitioner's board of directors with respect to nonmember activity.

The second source of nonmember revenue is that which petitioner receives from food and beverage sales from nonmember banquets other than those associated with golf tournaments. These banquets are usually held once or twice a month on Saturday evenings. There are also some nonmember banquets held during the week around the Christmas holiday season.

The record is not clear with respect to the amount of nonmember food and beverage revenue which is associated with the nonmember golf tournaments as opposed to that which is independent of golf tournaments. As stated previously, however, the nonmember revenues, other than the

---

[6]The "directly connected with" language should not be confused with the accounting classification of direct and indirect expenses. Even the indirect expenses listed previously have been stipulated as being directly connected with each nonmember activity.

[7]The club is usually closed on Monday and this is when the nonmember tournaments are normally held. If a particular Monday happens to be a holiday, however, the club will remain open but will be closed on Tuesday. Occasionally a nonmember tournament will be held on such a Tuesday.

interest income, emanate from only two sources. This is so despite the parties' stipulated classification of the nonmember activities into the five categories of golf, golf carts, food, beverage, and guest fees. One source of nonmember revenue is the golf tournament activity, which includes golf, golf carts, a portion of the food and beverage revenue, and guest fees.[8] The other source is the food and beverage revenue emanating from nonmember banquets independent of golf tournaments.

Prices paid by nonmembers for the use of petitioner's facilities are substantially higher than those paid by members. In 1979, nonmember golf tournament participants paid a greens fee of $11, while the greens fee paid by guests of members was $7.50.[9] If a member or his/her guest rented a golf cart, the cost was $9 or $10, while the cost of the mandatory golf cart rental to nonmember tournament participants was $10 or $11. The same escalated pricing structure applied to the cost of food and drink at nonmember banquets whether or not they were associated with golf tournaments.

In allowing nonmember activity, petitioner was very concerned about keeping the level of inconvenience to its members at a minimum. The record contains minutes of board of directors meetings where such concerns were discussed and appropriate policy changes enacted. In 1979, the policies with respect to these concerns served to limit the number of nonmember golf tournaments to six per year and to assure that they were held on days when the club was closed to members.[10] With respect to banquets not associated with golf tournaments, petitioner avoided inconveniencing its members by maintaining separate facilities for members and nonmembers and by giving members priority in the use of the banquet facilities.[11]

---

[8]The record does not clearly point out the source of the guest fees. In his brief, however, respondent states that the guest fees were collected in connection with the nonmember golf tournaments. This is a reasonable inference, and we see no reason to find otherwise.

[9]The cost of a membership in 1979 was $7,500, and the dues were $110 or $115 per month. Members are not charged greens fees. Members are charged golf fees for their guests, however, in an amount which is less than that charged for the nonmember tournaments.

[10]See note 7 *supra*.

[11]Petitioner maintains dining facilities which are restricted for member use only. In addition, a large banquet room is available for use by members or nonmembers. Petitioner also maintains three bars, two of which are limited to member use and the other is connected with the large banquet facility and is available to whomever uses that facility.

568

Various economic considerations were taken into account when decisions were made by the club with regard to its nonmember activities. Thus, in setting prices for nonmember activities, petitioner attempted to strike an appropriate balance between maximizing revenue and remaining competitive with other establishments offering similar services. Petitioner also attempted to minimize the costs of providing nonmember activities. For example, a concerted effort was made to schedule all nonmember banquets not associated with golf tournaments on evenings when member dining activity was high. This is because the kitchen was already staffed and open, thereby reducing startup costs. In gauging the nonmember activities for profit, the cost of the goods, the cost of help, and overhead[12] were considered. It appears that only direct expenses (as defined previously) were taken into account when measuring the profitability of nonmember activities, and indirect expenses were not considered. This was so even though the indirect expenses would be allocated to the nonmember activities for purposes of computing Federal income taxes.

Petitioner's view with respect to the profitability of nonmember activities was that as long as the revenue derived from a particular activity exceeded the direct cost of maintaining that activity, it would be deemed a profitable (beneficial) activity. As long as the nonmember activities generated revenue in excess of direct cost, petitioner realized a double benefit: positive cash-flow and partial defrayal of fixed (indirect) costs, such as depreciation and property taxes.

For purposes of computing Federal income tax, petitioner has consistently deducted from nonmember revenue an allocable portion of the indirect expenses, as well as the direct expenses associated with the production of the nonmember revenue.

Analysis of petitioner's tax returns for the year in issue (1979) and the 5 previous years (1974-78) indicates that the nonmember golf, golf cart rental, and interest income activities were operated at a consistently profitable level (for tax purposes), while the overall food and beverage sales

[12]"Overhead," in this regard, means any other expenses incurred to hold the function.

to nonmembers showed consistent losses. Once again we note that for tax accounting purposes, a portion of petitioner's fixed costs were allocated to these activities. In fact, these losses for each year were significant enough that when all nonmember activities were aggregated (whether properly or not) an overall loss resulted.

## ULTIMATE FINDING OF FACT

Petitioner was engaged in all of its nonmember activities with the intention of making a profit.

## OPINION

Petitioner is a tax-exempt social club pursuant to section 501(c)(7)[13] and as such, its Federal tax consequences are governed by subsections (a) and (b) of section 501. Generally an exempt organization, such as petitioner, is exempt from income tax. Sec. 501(a). This exemption, however, is limited and petitioner is subject to the tax imposed (under sec. 511) on any unrelated business taxable income. Sec. 501(b).

Section 511(a) imposes an income tax at the general corporate rates found in section 11 on unrelated business taxable income of most exempt organizations that are not trusts described in subsection (b) of section 511.[14]

The term "unrelated business taxable income" (herein UBTI) is defined, generally, in section 512(a)(1) as follows:

(1) GENERAL RULE.—Except as otherwise provided in this subsection, the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b).

---

[13]Sec. 501(c)(7) organizations are defined as "Clubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder."

[14]Petitioner's 1979 Form 990-T (Exempt Organization Business Income Tax Return) indicates that petitioner operated as a trust. Although the record is not clear in this regard, we believe that petitioner operated as a corporation. Respondent is apparently in agreement with this conclusion. In his notice of deficiency, respondent determined a $2,846 deficiency on revised, unrelated business taxable income of $16,742. Respondent has applied the sec. 11(a) corporate rates in effect for 1979, and not the sec. 1(e) rates applicable to trusts (see sec. 511(b)), which tax this level of income at a marginal rate of 42 percent. Petitioner certainly would be in agreement with the conclusion that it operated as a corporation since the corporate rates then in effect are more favorable than the rates applicable to trusts.

There are, however, specific rules for ascertaining the UBTI of social clubs, as well as some other types of exempt organizations. Section 512(a)(3), as in effect in 1979, in relevant part, provides as follows:

(A) GENERAL RULE.—In the case of an organization described in section 501(c)(7) or (9), the term "unrelated business taxable income" means the gross income (excluding any exempt function income), less the deductions allowed by this chapter which are directly connected with the production of the gross income (excluding exempt function income), both computed with the modifications provided in paragraphs (6), (10), (11), and (12) of subsection (b). * * *

The parties are in agreement as to the amount of gross income derived by petitioner from its unrelated trade or business activities. Disagreement, however, arises as to whether the losses generated from petitioner's activities can be utilized to offset income realized by petitioner from its investments. Only activity conducted with the objective of taxable profit, argues respondent, can be so utilized. Further, respondent argues that each separate activity—golf fees, golf carts, food, bar, and guest fees—must be separately analyzed in order to determine profit motivation.

### Classification of Activities [3]

For the tax year in issue (1979), petitioner had total gross income in excess of $1.2 million. The bulk of this gross income is exempt function income under section 512(a)(3)(B). However, with respect to unrelated business taxable income, the stipulation of facts, in relevant part, provides:

7. During the year 1979, petitioner received interest income of $10,098.

8. During 1979, petitioner derived gross income from nonmembers in the following activities:

  (a) Golf
  (b) Golf Carts
  (c) Food
  (d) Bar
  (e) Guest Fees

  \*      \*      \*      \*      \*      \*      \*

10. [This stipulation incorporates by reference to an attached exhibit the chart produced above outlining the revenues and expense for each activity].

We believe that the classification of petitioner's UBTI-producing activities into six separate categories (the five mentioned in stipulation No. 8 and interest income) is misleading and contrary to facts disclosed by the record as a whole. Therefore, we are not bound by this aspect of the stipulation. See *Jasionowski v. Commissioner*, 66 T.C. 312, 318 (1976). See also *Mead's Bakery, Inc. v. Commissioner*, 364 F.2d 101, 106 (5th Cir. 1966).

As stated in the findings of fact, petitioner was involved in only three nonmember activities. These are: (1) Nonmember golf tournaments which encompassed golf, golf cart rentals, guest fees, and a portion of the food and beverage revenues; (2) nonmember food and beverage sales not associated with golf tournaments; and (3) production of interest income.

Support for our conclusion in this regard can be found in the record. Respondent in his brief suggested that the guest fees were collected in connection with the nonmember golf tournaments. [15] It was petitioner's policy to require mandatory golf cart rentals and a mandatory luncheon or banquet with each nonmember golf tournament. With respect to the food and beverage sales not associated with golf tournaments, the record indicates that these derive from one source, the occasional use of petitioner's banquet facilities by nonmembers.[16] Applying commonsense standards, petitioner realized income from three nonexempt activities, all of which were entered into with the purpose of the production of profit: (1) Golf tournaments with associated banquets, fees, and golf cart rentals; (2) nonmember banquets; and (3) production of interest.

Our classifications of petitioner's UBTI-producing activities are the only reasonable conclusions which can be formed from the record as a whole. We are faced with the problem, however, that the food and beverage revenues (and

---

[15]See note 8 *supra*, and accompanying text.

[16]The facts as developed in the record lend support to our reclassification of petitioner's UBTI producing activities. With respect to petitioner's golf tournament activity, there is certainly a great deal of organizational and economic interdependence among the golf revenues and the golf cart rental revenues. Also petitioner *required* that a banquet or luncheon take place with each golf tournament. The purpose behind this requirement was to increase revenues associated with each golf tournament. There is no need to discuss the nontournament food and beverage activity, other than to say that it is usual at a banquet to serve both food and drinks and they should be considered as one income producing activity.

expenses) were stipulated as though each constituted a separate activity. The stipulated figures represent the total food and beverage sales to nonmembers without allocation to the appropriate generating activity—that is whether they were generated by golf tournament banquets or nontournament banquets. In view of our ultimate conclusion, however, that both of these activities were entered into with a profit motivation, it becomes unnecessary for us to have such a breakdown.

In arriving at our conclusion that petitioner entered into the nonmember golf tournament activity and the banquet activity with an objective for profit, we accept respondent's position that we must analyze each activity separately for profit motivation. Further, we look to the question of objective for profit not from the vantage point of *taxable* profit, as respondent urges, but rather from the standpoint of an incremental increase in available funds to petitioner. Thus, we keep in mind the fact that petitioner would incur the various fixed costs such as depreciation and overhead whether or not petitioner held golf tournaments or banquets. Thus, each dollar earned over and above the *direct* costs of each activity served to profit petitioner. When so viewed, the facts indicate petitioner received revenues (gross proceeds less direct costs) in 1979 as follows:

*Golf tournaments*

| | |
|---|---|
| Greens fees | $4,350 |
| Golf carts | 7,844 |
| Guest fees | 1,015 |
| Banquets (food and bar) | Unknown percentage of $11,073[17] |

*Banquets*

| | |
|---|---|
| Food and bar | Unknown percentage of $11,073 |

An analysis of petitioner's nonexempt activities in earlier years also yields similar results.

Respondent contends, however, that we must look to *taxable* income in order to determine whether there is profit

---

[17] We cannot allocate the food and bar revenues between those banquets associated with the golf tournaments and those standing alone. However, looking at the figures in gross, we see that food and bar generated $11,073 in revenues prior to the deduction of fixed costs.

motivation. He argues that since petitioner is allowed to deduct an allocable portion of the fixed or indirect costs in arriving at unrelated business taxable income, petitioner should also be required to take these costs into consideration in regard to determining profit motivation. Petitioner is, in effect, says respondent, having it both ways. While there is a certain pleasing symmetry to respondent's argument, we do not believe it to be determinative of the question before us.[18] The record as a whole makes it apparent that petitioner was seeking profit from these activities, and we so hold.

Having arrived at this determination, we now consider whether the losses incurred for tax purposes should be deductible from the other nonexempt income received by petitioner.

### Computation of Petitioner's UBTI

Computation of petitioner's UBTI is governed by the special rule of section 512(a)(3) and not the general rule of section 512(a)(1).

What we must ultimately decide is the extent to which (if at all), under section 512(a)(3), excess expenses from one of petitioner's UBTI-producing activities[19] can be used to offset net profit from other such activities. To resolve this, we must decide whether computation of UBTI under section 512(a)(3)(A) is to be made on an activity-by-activity basis or in the aggregate. Section 512(a)(3) provides that UBTI means gross income (excluding exempt function income), "less the deductions allowed by this chapter which are directly connected with the production of the gross income (excluding exempt function income)." Since the statute is not clear on this point, our question must be whether Congress intended an aggregate approach. We look to the history of section 512. See *United States v. Public Utilities Commission of California*, 345 U.S. 295, 315 (1953).

For taxable years prior to those beginning January 1, 1970, section 501(c)(7) organizations, such as petitioner,

---

[18]We note that it is respondent who allows the deduction of the indirect fixed costs against the nonexempt income; costs which otherwise would be borne in their entirety by the club membership.

[19]Excess expenses from a UBTI-producing activity result when the expenses directly connected with the production of gross income from the activity exceed that gross income.

were not subject to tax on UBTI. Unless the organization's exemption was revoked, all income (whether or not related to the organization's exemption function) escaped taxation. See *Ye Mystic Krewe of Gasparilla v. Commissioner*, 80 T.C. 755, 762 (1983) (citations omitted).

Congress, however, changed this situation in regard to income from nonexempt activities by the enactment of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, which subjected social clubs to a tax on UBTI for years beginning after December 31, 1969. The relevant provision (codified in sec. 512(a)(3)(A)) resulted from a proposal by the Treasury Department which read, in part, as follows:

Thus, under the proposal, all income, other than that from members in exchange for exempt function facilities, would be included in gross income, whether or not the activities generating the income were sufficient to meet the requirements of a "trade or business regularly carried on" generally applicable under the unrelated business income tax. Income from an investment would be subject to the tax whether or not the activities engaged in by the social club in generating that income were sufficient to meet the "trade or business" test of the nonrelated business income tax. * * *

* * * * * * *

The computation of income subject to the tax would be similar in most respects to the computation presently applicable under the unrelated business income tax in general. However, consistent with the elimination of the "trade or business regularly carried on" tests, deductions would be allowable if directly connected with *an activity generating income* subject to tax, rather than only if directly connected with an unrelated trade or business regularly carried on. * * *

[Technical Explanation of Treasury Tax Reform Proposals, Hearings on the Subject of Tax Reform before the Comm. on Ways and Means, 91st Cong., 1st Sess., part 14, at 5050, 5139-5141 (1969); fn. ref. omitted; emphasis included.]

The purpose behind the change extending the tax on UBTI to social clubs was stated in the Senate Finance Committee report as follows:

Since the tax exemption for social clubs and other groups is designed to allow individuals to join together to provide recreational or social facilities or other benefits on a mutual basis, without tax consequences, the tax exemption operates properly only when the sources of income of the organization are limited to receipts from the membership. Under such circumstances, the individual is in substantially the same position as if he had spent his income on pleasure or recreation (or other benefits)

without the intervening separate organization. However, where the organization receives income from sources outside the membership, such as income from investments (or in the case of employee benefit associations, from the employer), upon which no tax is paid, the membership receives a benefit not contemplated by the exemption in that untaxed dollars can be used by the organization to provide pleasure or recreation (or other benefits) to its membership. For example, if a social club were to receive $10,000 of untaxed income from investment in securities, it could use that $10,000 to reduce the cost or increase the services it provides to its members. In such a case, the exemption is no longer simply allowing individuals to join together for recreation or pleasure without tax consequences. Rather, it is bestowing a substantial additional advantage to the members of the club by allowing tax-free dollars to be used for their personal recreational or pleasure purposes. The extension of the exemption to such investment income is, therefore, a distortion of its purpose. [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 469-470.]

The House Ways and Means Committee report points out that one of the main reasons for the changes was to tax passive income, such as interest. That report stated:

The bill also imposes a tax on investment income of organizations which are exempt on the grounds of mutuality or common membership. Social clubs, for example, are operated for the benefit of members and any profit derived from rendering the services to members is used by the club for the benefit of the members. Therefore, where a social club has income from interest, dividends, rents, royalties, etc., this income reduces the members' costs below the actual cost of providing the personal facilities made available by the organization. Because of this, the bill would tax the social clubs and these other membership organizations on all income other than that derived from rendering services to the members. This income would be treated and taxed as business income. [H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 231.]

We considered a somewhat similar problem in *Ye Mystic Krewe of Gasparilla v. Commissioner*, 80 T.C. 755 (1983). Ye Mystic Krewe was an exempt social club in Tampa, Florida, which sponsored a number of social events such as banquets, balls, tea dances, a parade, and a closing party. Its principal activity was a mock invasion of the city of Tampa, utilizing a replica of a West Indian bark, the Jose Gaspar. After the club's "pirates" debarked and captured the city, there was an annual parade of about 2½ hours in which some members of the Krewe participated. The city of Tampa awarded concession rights to the Krewe along the parade route. The Krewe also received proceeds from an

576

official logbook of the proceedings. In addition to these income sources, the Krewe realized revenue from interest on savings accounts and Treasury bills. The bulk of its revenues, however, came from assessments on its members. We held that the concession income and interest income both constituted unrelated business taxable income. We then went on to determine that the Krewe was not entitled to offset the expenses of staging the invasion and parade against the concession income received by it, holding that the expenses of staging the invasion and parade were not "directly connected with the production" of the concession income within the meaning of section 512(a)(3)(A). In *Krewe*, the taxpayer received only the net income from the concessions and logbook sales so that in effect, the expenses were already deducted from the gross proceeds since respondent agreed that the net amount constituted the unrelated business income. Further, we note that in *Krewe*, the taxpayer was attempting to offset some of the costs of its exempt activities against the unrelated income.

We then considered somewhat the same issue in *The Brook, Inc. v. Commissioner*, T.C. Memo. 1985-462, and supplemental opinion T.C. Memo. 1985-614, in which we held that a social club could not offset its net losses from nonmember food and beverage sales against the passive income it realized from investments. In *The Brook*, the taxpayer conceded that the prices charged for food and beverage services (the same to nonmembers as to members) were not intended to produce a profit and in fact they did not. We held in our supplemental opinion that "To the extent that the excess expenses resulting from nonmember food and beverage service, a nonexempt activity, were applied to reduce the taxable income from petitioner's investments—another and unrelated nonexempt activity—such investment income was shielded from taxation and was available to subsidize the operations of petitioner for the benefit of its membership." We held this to be contrary to the legislative history of section 512(a)(3). Upon appeal, the Second Circuit affirmed our decision but upon the different ground that deductions were allowable only if the deductions would be allowed under chapter 1 of the Internal Revenue Code. The Circuit Court held that the social club

did not satisfy the trade or business requirements of section 162 in order to take such deductions, since it admittedly did not intend to profit from the nonexempt food and beverage activities. 799 F.2d 833 (2d Cir. 1986).[20] In arriving at its conclusion, the court disagreed with our reasoning that there must be a direct connection between the expenses incurred and the specific income to be offset.

The Sixth Circuit, in *Cleveland Athletic Club v. United States*, 779 F.2d 1160 (1985), has taken yet a third approach. In *Cleveland Athletic Club* the club derived unrelated business income from investments as well as from sales of food and beverages to nonmembers. During the year in question the gross nonmember sales receipts exceeded the direct expenses or cost of sales attributed thereto. However, after the indirect costs were allocated to the sales, loss resulted similar to the losses in the case at bar. Respondent argued that the club did not have a profit motive with respect to the nonexempt sales and that the net losses attributable to such sales could not be offset against the net investment income. The District Court below held, in cross-motions for summary judgment, that the club's primary motive with respect to the nonmember food and beverage activity was not to earn a profit but rather to lessen the financial burden on its members. The Sixth Circuit, in reversing the court below, interpreted section 512(a)(3) to mean that deductions are allowable if they meet the standard as ordinary and necessary to the production of income with a basic purpose of economic gain. The court went on to state (779 F.2d at 1165) "We do not believe that the non-member business activity must generate a *tax* profit." (Emphasis supplied.)

Unlike the situation we considered in *The Brook, Inc. v. Commissioner, supra*, the petitioner herein has clearly shown profit-seeking motivation in its various nonexempt activities. Thus, the rationale in *The Brook*, either in our

---

[20]The taxpayer in *The Brook* argued that a tax-exempt social club was entitled to apply excess expenses from one unrelated business activity that was not profit motivated against income from a second unrelated business activity, net investment income. Support for this proposition may be found in *Cleveland Athletic Club, Inc. v. United States*, 779 F.2d 1160 (6th Cir. 1985). We rejected this position in *The Brook*. See T.C. Memo. 1985-462; T.C. Memo. 1985-614.

opinion or in the affirmance by the Second Circuit, does not appear determinative of the case at bar.

Respondent in his deficiency notice, at trial, and on brief has devoted much of his argument to whether petitioner had a profit motivation, based upon Rev. Rul. 81-69, 1981-1 C.B. 352. That ruling concerned itself with a situation in which a club, such as that at bar, "sells food and beverage to nonmembers at prices insufficient to recover the costs of such sales." The ruling held that because the sales were not "profit motivated" the social club could not offset losses from such sales against its net investment income. The ruling does not elaborate upon the question we have considered here: whether there is a profit motivation where the nonexempt activities would have produced taxable income were it not for the allocation to them of fixed and indirect costs, items which would have been borne by the membership had the nonexempt activities not occurred.

Respondent relies in Rev. Rul. 81-69, as well as in his argument herein, upon the decision in *Iowa State University of Science & Technology v. United States*, 205 Ct. Cl. 339, 500 F.2d 508 (1974). The taxpayer in that case (a sec. 501(c)(3) educational organization exempt from income tax, but subject to tax on UBTI) operated a commercial television station subject to unrelated business tax and two nonprofit radio stations not subject to tax. The specific issue before the Court of Claims was whether expenses from the nonprofit radio stations, which operated at net losses, could be used to offset net income from the commercial television station. Because the radio stations were operated without a profit motive and since section 162 allows for the deductibility only of expenses ordinary and necessary to trade or business (i.e., an activity entered into for profit), the court held the expenses from the radio stations could not be used to offset the net income of the commercial television station in computing the taxpayer's UBTI. *Iowa State University of Science & Technology, supra* at 520-521. There are, of course, important distinctions between the *Iowa State University of Science & Technology v. Commissioner* case and the present situation. First, that case involved computation of UBTI under section 512(a)(1) which uses the "trade or business" language and not the special

rule of section 512(a)(3) at issue here. Section 512(a)(3), when applicable, contains no reference to unrelated trade or business, and allows deductions allowed by chapter 1 "which are directly connected with the production of the gross income." Secondly, in *Iowa State University of Science & Technology* the taxpayer was attempting to offset the costs of its exempt activity (the radio stations) against its nonexempt activity (the commercial television station). Petitioner here is simply attempting to offset losses from one nonexempt activity entered into for profit against gains from another.[21] This is different from the situation we considered in *Ye Mystic Krewe of Gasparilla v. Commissioner, supra,* where the attempt was to offset the costs of the "invasion" of Tampa, one of the exempt activities, against the proceeds from the sale of the logbook and other concessions. We stated in *Krewe,* 80 T.C. at 764:

> Congress clearly considered that nonmember income should not be used to subsidize the activities carried on for members, and there is absolutely no reason to believe that Congress meant for such a rule to apply only to income derived from a trade or business regularly carried on. In fact, the Treasury Explanation expressly rejects such a possibility, and the discussion in the committee reports of investment income also shows that the rules of section 512(a)(3) were not to be limited to income from a trade or business regularly carried on. If the Krewe's position were adopted, investment income or income from a business not regularly carried on could be used to subsidize the activities of members, and such a result is manifestly inconsistent with the objective of section 512(a)(3) and its legislative history.

Congress did not, on the other hand, intend to disallow the deduction of losses from one profit-motivated transaction against the revenue from another. In arriving at our conclusion in favor of petitioner herein, we have relied upon the language of section 512(a)(3) and its legislative history. We have not relied upon Proposed Treasury Regulation section 1.512(a)-(3)(b)(3).[22] Proposed regulations are not enti-

---

[21]To the extent that respondent allows the allocation of some of petitioner's indirect and fixed costs against the gross proceeds from the nonexempt activity, it can be argued that *Iowa State University of Science & Technology* is relevant. However, it is respondent who has chosen to allow such allocations (sec. 1.512(a)-1(c), Income Tax Regs.).

[22] The proposed regulation reads as follows:

"*Income from more than one source.* In the case of a social club or an employee's association which derives gross income (excluding exempt function income) from two or more sources, its unrelated business taxable income is computed by aggregating its gross income from all such

tled to judicial deference. See *Scott v. Commissioner*, 84 T.C. 683, 690 (1985). We note, however, that the result we reach here is consistent with the proposed regulation.

Similarly, we are not bound by the decisions of either the Second Circuit in *The Brook, Inc. v. Commissioner, supra,* or the Sixth Circuit in *Cleveland Athletic Club, Inc. v. United States, supra,* both of which decisions are distinguishable. Should the instant case be appealed, the appeal would be to the Ninth Circuit. See *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. without discussion of this point 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

*Decision will be entered for the petitioner.*

Reviewed by the Court.

STERRETT, CHABOT, NIMS, PARKER, WHITAKER, SHIELDS, HAMBLEN, SWIFT, JACOBS, WRIGHT, PARR, WILLIAMS, and WELLS, *JJ.,* agree with this opinion.

GERBER, *J.,* did not participate in the consideration of this case.

---

sources and by aggregating its deductions allowed with respect to such gross income. [36 Fed. Reg. 8809 (May 13, 1971.]"